**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

**JOE L. HARRIS, JR.,**
4355 County Road 7200
West Plains, Missouri 65775

**JENNIFER L. HARRIS,**
4355 County Road 7200
West Plains, Missouri 65775

**WEST 160 SCRAP & SALVAGE, LLC,**
4420 U.S. Highway 160
West Plains, Missouri 65775

**SOUTHERN MISSOURI & NORTHERN
ARKANSAS RECYCLING, LLC,**
4420 U.S. Highway 160
West Plains, Missouri 65775

               **Plaintiffs,**

   **v.**

**FREDERICK J. RUNDE,**
502 W. State Street
Belmont, Wisconsin 53510

**R. TODD PECKHAM,**
104 Lake Drive
Alton, Illinois 62002

**CLAYTON COUNTY RECYCLING, INC.,**
Frederick J. Runde, Registered Agent
11645 Echo Avenue, Box 861
Monona, Iowa 52159

**MIGHTY RIVER RECYCLING, LLC,**
J. Thomas Long, Registered Agent
2410 State Street
Alton, Illinois 62002

               **Defendants.**

Case No. _____

**DEMAND FOR JURY TRIAL**

<u>**COMPLAINT**</u>

Plaintiffs Joe L. Harris, Jr., Jennifer L. Harris, West 160 Scrap & Salvage, LLC, and Southern Missouri & Northern Arkansas Recycling, LLC, for their Complaint against Defendants Frederick J. Runde, R. Todd Peckham, Clayton County Recycling, Inc., and Mighty River Recycling, LLC, state and allege as follows:

## NATURE OF THE CASE

1.      This case is about the perils of trust in business relationships. Joe Harris and his wife, Jennifer, successfully operated a scrapyard business at multiple locations in Missouri and Arkansas for nearly a decade. In September 2013, wishing to pursue other ventures, the Harris's decided to sell their businesses and the land on which they were located as turn-key scrapyard operations. The Harris's pitched the opportunity to Fred Runde and Todd Peckham, two businessmen who owned scrapyards in Iowa and Illinois, respectively. Runde and Peckham soon agreed to make the purchase. The Harris's had previously done business with Peckham, and had explored the possibility of a joint venture with Runde. The Harris's trusted that Runde and Peckham would follow through on their promise.

2.      The Harris's trust in Runde and Peckham was misplaced. After repeatedly agreeing to purchase the land and businesses, Runde and Peckham pulled a classic bait-and-switch: when the Harris's went to Peckham and Runde's attorney's office to sign *sale* documents, they were instead presented with a *lease* agreement. Peckham dispelled the Harris's concerns by telling them that the lease agreement was a temporary measure, that he and Runde would close on a purchase no later than March 2014, and that, in the event things went south, the lease agreement was terminable by the Harris's at any time upon thirty days' notice. All of these representations turned out to be false. But the Harris's, believing Runde and Peckham to be acting in good faith, went ahead and signed the lease agreement. The Harris's even agreed to

manage the scrapyards' operations during the lease term to help Runde and Peckham with the transition in ownership.

3.      Runde and Peckham's deceit did not end there. Several weeks into the lease term, when the Harris's pressed Runde and Peckham as to when the purchase agreement would be forthcoming, the two sent the Harris's an agreement giving them the *option* to purchase the business's land and assets. Once again, Runde and Peckham assured the Harris's that the purchase was certain to occur. And once again, the Harris's put their trust in Runde and Peckham and signed the agreement.

4.      In February 2014, the other shoe dropped. Shortly after the Harris's asked Runde and Peckham to reimburse them for certain expenses incurred on their behalf, Runde and Peckham fired the Harris's as managers of the businesses, ejected them from the premises, and told them not to return. Over the next nine months, Runde and Peckham went about destroying what the Harris's had worked for ten years to build. Runde and Peckham dismantled and misused equipment and operated the scrapyards without regard for environmental safety. On one occasion, Harris witnessed a ***river of oil several feet wide*** running from one of his properties onto the adjacent roadway. All efforts to make Runde and Peckham address these conditions were unsuccessful.

5.      When the Harris's finally regained control of their businesses upon expiration of the lease in November 2014, they were horrified at what they discovered. Nearly all of their equipment was damaged, disassembled, or missing. Even worse, standing pools of oil and similarly blatant environmental pollution was present at all of the properties. Realizing they could not possibly resume operations, the Harris's were forced to file for bankruptcy on behalf of their business. Jennifer Harris was also forced to file for personal bankruptcy.

6.      Not only are Runde and Peckham directly responsible for destroying the Harris's livelihood, but they appear to have done so for their own profit. Upon information and belief, Runde and Peckham have attempted to purchase the Harris's land and equipment at bankruptcy auctions, and will use those assets to fill the void they have created in the scrap metal market. Accordingly, the Harris's have filed this suit to recover for the damage caused by Runde and Peckham's malicious conduct, and to ensure that no other honest businesspeople fall victim to Runde and Peckham's machinations.

## PARTIES

7.      Plaintiffs Joe L. Harris, Jr. ("Harris") and Jennifer L. Harris ("Jennifer Harris") (together, the "Harris's") are Missouri citizens who reside in Howell County, Missouri. Harris and Jennifer Harris are married.

8.      Plaintiff West 160 Scrap & Salvage, LLC ("West 160"), is a Missouri limited liability company with its principal place of business in West Plains, Missouri.

9.      Plaintiff Southern Missouri & Northern Arkansas Recycling, LLC ("SMNA"), is a Missouri limited liability company with its principal place of business in West Plains, Missouri.

10.     Defendant Frederick J. Runde is a Wisconsin citizen who resides in Belmont, Wisconsin.

11.     Defendant R. Todd Peckham is an Illinois citizen who resides in Alton, Illinois.

12.     Defendant Clayton County Recycling, Inc., is an Iowa corporation with its principal place of business in Monona, Iowa.

13.     Defendant Mighty River Recycling, LLC, is an Illinois limited liability company with its principal place of business in Madison, Illinois.

4

## JURISDICTION AND VENUE

14.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367 because this action involves claims arising under the laws of the United States, and other claims that are so closely related to those claims that they form part of the same case or controversy.

15.      Alternatively, this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

16.      This Court has personal jurisdiction over Defendants because Defendants have conducted business in Missouri and committed tortious acts in Missouri that have injured Plaintiffs, as described below. Accordingly, Defendants have sufficient minimum contacts with Missouri to invoke this Court's jurisdiction.

17.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claim occurred in this judicial district. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because Defendants are subject to this Court's personal jurisdiction.

18.      Divisional venue is proper in the Southern Division under Local Rule 3.1(b)(3) because none of the Defendants is a resident of the Western District of Missouri, and Plaintiffs reside in the Southern Division.

## FACTS COMMON TO ALL COUNTS

### *Runde and Peckham Gain the Harris's Trust*

19.      Harris is the owner and operator of West 160. Founded in 2004, West 160 was a scrap metal recycler and seller that deals in ferrous and non-ferrous metals. West 160 had five

Case 6:15-cv-03453-MDH   Document 1   Filed 10/21/15   Page 5 of 32

operating facilities: West 160 Scrap & Salvage, in West Plains, Missouri; Eleven Point Recycling, in Willow Springs, Missouri; Twin Lakes Recycling, in Mountain Home, Arkansas; White River Recycling, in Mountain View, Arkansas; and Spring River Recycling, in Hardy, Arkansas. The Harris's own the six parcels of improved and unimproved real estate upon which the West 160 facilities are located (collectively, the "Premises"). Due to Defendants' tortious conduct, as further described below, West 160 is no longer an active business.

20.     In summer 2012, Harris was introduced to Peckham through a business acquaintance. Harris learned that Peckham is the Manager and sole member of Mighty River, a company engaged in the same type of business as West 160. Except where otherwise specified, all below references to Peckham refer to him acting on behalf of both himself, and as manager and sole member of Mighty River.

21.     Harris and Peckham discussed their respective businesses and reached two agreements between Mighty River and West 160: a "Broker Agreement," and a "Storage Agreement."

22.     Under the oral Broker Agreement, Mighty River sold West 160 scrap steel to a nearby steel mill with which Peckham had a preexisting business relationship. Mighty River returned the proceeds to West 160 and retained a broker's fee.

23.     Under the written Storage Agreement, West 160 allowed Mighty River to take delivery of and store ferrous scrap metal at the Premises. Mighty River was to pay West 160 a storage fee in the amount of fifty percent of the net profit it received from the subsequent sale of the scrap metal to third parties. The Storage Agreement is attached as Exhibit A and is incorporated herein by reference.

24.     The Broker Agreement continued without incident for about four months.

6

25.     West 160 performed its obligations under the Storage Agreement, but, as explained below, Mighty River did not.

26.     In July 2013, Peckham introduced Harris to Runde via telephone. Harris learned Runde is the owner of Clayton County, a company engaged in the same type of business as West 160 and Mighty River. Except where otherwise specified, all below references to Runde refer to him acting on behalf of both himself, and as owner of Clayton County.

27.     Shortly thereafter, Harris took Runde on a tour of the Twin Lakes property. The three discussed the possibility of Runde and Peckham investing in West 160 so that it could expand its operations through the purchase of a "shredder."

28.     Though Harris and Runde engaged in preliminary discussions for several months concerning this potential joint investment, Runde decided around September 2013 that he was not interested in such an investment, and the plan did not move forward.

### The Harris's Decide to Sell, and Runde and Peckham Set the Trap

29.     Soon after the discussions regarding the joint investment fell apart, Harris decided to exit the scrap metal business. Harris planned to sell the Premises and West 160's assets as turn-key scrapyard operations.

30.     Harris informed Peckham of his plans. Peckham responded to Harris that he and Runde were interested in buying West 160, including all equipment and other assets, and the Premises upon which the scrapyards are located.

31.     Harris was willing to sell to Runde and Peckham, and began to prepare the West 160 facilities for sale.

32.     Through late September and October of 2013, Runde and Peckham both visited each of the West 160 facilities at least once.

7

33.     On these visits, Runde and Peckham fully inspected the Premises and all aspects of each facility's operations. Runde and Peckham inspected the equipment and machinery and watched it in operation.

34.     In October 2013, Peckham had discussions with West 160's accountant and the banks responsible for its financing.

35.     In mid-October 2013, Runde and Peckham told Harris they would purchase of West 160 and the Premises. Runde and Peckham told Harris their attorney would prepare the agreements necessary to document the sale.

36.     Runde and Peckham reiterated they would buy the Premises and West 160's assets in multiple telephone calls within the mid-October 2013 timeframe. To ensure a smooth transition of ownership and maintain business with West 160's suppliers, Runde and Peckham asked Harris to have West 160 continue buying scrap until the purchase could be completed, and told Harris they would reimburse him for all such purchases. West 160 subsequently purchased approximately $150,000 worth of scrap in reliance on Runde and Peckham's representations.

37.     On or about October 25, 2013, Harris and Jennifer Harris (neither of whom had legal representation) met Peckham at the office of Runde and Peckham's attorneys in O'Fallon, Illinois. Based on his prior discussions with Runde and Peckham, Harris believed the purpose of the meeting was to sign closing documents for the sale of the Premises and West 160's assets.

38.     Instead, when Harris arrived at the meeting, he was presented with a lease agreement. The lease agreement provided for the Harris's to lease the Premises, and West 160 to lease its equipment, to Bi-State Scrap and Recycling, LLC ("Bi-State"), a new entity formed by Runde and Peckham.

8

39.     Harris asked Peckham why he was being presented with a lease agreement when Runde and Peckham had previously agreed to purchase the Premises and West 160's equipment.

40.     Peckham promised Harris that the lease was a temporary measure. Peckham further promised that he and Runde would close on the purchase of West 160 no later than March 1, 2014. As Peckham put it, "in for a penny, in for a pound."

41.     Furthermore, Runde and Peckham's counsel, acting on their behalf, assured the Harris's that they could terminate the Lease Agreement at any time with thirty days' notice. The Harris's did not discover until several months later that this statement was untrue; only Bi-State had the option to terminate.

42.     To demonstrate their good-faith intent to purchase the Premises and Equipment, Peckham offered to pay the Harris's the equivalent of a $100,000 annual salary to manage the scrapyards' business operations until a purchase agreement could be finalized. The Harris's agreed.

43.     Relying on Runde and Peckham's representations that they would close on the purchase of the Premises and Equipment no later than March 1, 2014, the Harris's executed the lease agreement ("Lease Agreement") on behalf of themselves, West 160, and SMNA. The Lease Agreement is attached as <u>Exhibit B</u> and is incorporated herein by reference.

44.     Under the Lease Agreement, the Harris's leased to Bi-State the Premises, and West 160 and SMNA leased to Bi-State all furniture, fixtures, and equipment located on the Premises, with the exception of some equipment sold by West 160 to Bi-State under a contemporaneously executed Bill of Sale (the leased equipment is collectively referred to as the "Equipment"). *See* Lease Agmt. (Ex. B) at 2. The Lease Agreement provided for a one-year term

Case 6:15-cv-03453-MDH   Document 1   Filed 10/21/15   Page 9 of 32

beginning on November 1, 2013. *See id.* While SMNA is party to the Lease Agreement, it did not in fact own any portion of the Premises or Equipment.

45. In mid-to-late November 2013, the Harris's met in-person with Peckham at the West 160 property in West Plains and held a conference call with Runde to discuss some outstanding issues. The Harris's wanted to know (1) when they would be reimbursed for their October 2013 purchases of scrap, and (2) when a purchase agreement for the Premises and Equipment would be forthcoming.

46. In response to the first question, Runde and Peckham agreed to reimburse some of the expenses immediately, and promised that the remainder would be paid at closing of their purchase of the Premises and Equipment. While Runde and Peckham did reimburse West 160 for about $30,000 out of the $150,000 it had purchased. West 160 was never reimbursed by the remainder.

47. In response to the second question, Runde and Peckham reiterated that they would purchase the Premises and Equipment no later than March 1, 2014.

48. In December 2013, however, Runde and Peckham mailed Harris not a purchase agreement, but an agreement that gave them an *option* to purchase the Premises and Equipment. Nevertheless, Runde and Peckham again promised that they would close on the purchase of the Premises and Equipment on or before March 1, 2014.

49. Harris and Jennifer Harris, who again did not have legal representation, relied on Runde and Peckham's representations and executed the option agreement ("Option Agreement") on behalf of themselves, West 160, and SMNA.  The Option Agreement is attached as <u>Exhibit C</u> and is incorporated herein by reference.

50.     Under the Option Agreement, Bi-State was given the option to purchase the Premises and Equipment at any time during the term of the Lease Agreement, or within 90 days after the termination of the Lease Agreement. *See* Option Agmt. (Ex. C) at 2, ¶ 3. The exercise price for the Premises was equal to the remaining balance on the Premises' mortgages ($1,195,250) as reduced by rent payments made under the Lease Agreement. *See id.* at 13. The exercise price for the Equipment was $1,136,500, an amount agreed upon by Harris, Runde, and Peckham prior to the execution of the Option Agreement. *See id.* at 14-15.

51.     In the first week of December 2013, after the Option Agreement had been executed, a newly-built operating building located at the Eleven Point Recycling property collapsed due to heavy ice. Harris notified Runde and Peckham, and immediately began moving the materials that had been stored inside the building into another building on the property.

52.     Under paragraph 8(a) of the Lease Agreement, Bi-State was required to purchase an insurance policy covering loss or damage to the Premises and Equipment.

53.     Several weeks after the collapse, Harris learned that Runde and Peckham, acting through Bi-State, had collected the insurance proceeds arising from the collapsed operating building. The insurance policy named Bi-State as the insured party and Clayton County as an additional insured party. It did not name Harris, Jennifer Harris, or West 160 as an insured party.

54.     Instead of reconstructing the building in full, as the severe nature of the damage required, Runde and Peckham used a portion of the insurance proceeds to "repair" the building. The "repairs" did not restore the building to the new condition it was in prior to the collapse.

55.     Runde and Peckham did not remit the excess insurance proceeds to Plaintiffs, but instead converted the remaining insurance proceeds for their own use, or for the use of Clayton County, Mighty River, or Bi-State.

*Runde and Peckham Turn on the Harris's and Destroy Their Business*

56.     On February 3, 2014, without cause or prior notice, Runde and Peckham fired Harris as the manager of West 160. Runde and Peckham had Harris escorted off the Premises and told him not to return.

57.     Following his abrupt ejection from the management of West 160, Harris resolved to closely monitor the West 160 facilities through the duration of the lease.

58.     In April 2014, Harris found a river of oil several feet wide running from the Eleven Point Recycling property onto the adjacent roadway.

59.     Harris was shocked and dismayed at this discovery. All of the West 160 facilities were equipped with oil containment systems that fully satisfied Missouri and Arkansas environmental standards. In fact, the Missouri Department of Natural Resources even took photographs of one of West 160's oil containment systems as an example for other businesses.

60.     Harris contacted Runde regarding his observations at Eleven Point Recycling. Runde downplayed Harris's concerns, claiming that he was "making a mountain out of a molehill."

61.     Despite Runde's denials, Harris continued to observe a marked decline in the environmental conditions at all of the West 160 facilities. Harris regularly observed oil drums open and spilling onto the ground, while the oil containment systems went unused.

62.     About May or June of 2014, Harris learned that the West 160 Scrap & Salvage facility and the Eleven Point Recycling facility failed water sample tests required by the Missouri Department of Natural Resources.

63.     Before the Department of Natural Resources was to conduct a visual inspection of those two facilities, Harris observed large amounts of gravel hauled in and dumped on the

12

properties to eliminate the appearance of surface oil. Such dumping occurred at the direction of either or both Runde and Peckham.

64.    While the gravel dumping allowed the West 160 Scrap & Salvage facility and the Eleven Point Recycling facility to pass the Department of Natural Resources' visual inspections, it did nothing to alleviate the environmental damage caused by Runde and Peckham's failure to use proper oil containment techniques.

65.    On September 26, 2014, Harris gave Runde and Peckham notice that they were in default of the Lease Agreement due to their commission of waste, their failure to comply with state and federal environmental laws and regulations, and their failure to keep the Premises and Equipment in good condition, excepting ordinary wear and tear.

66.    Runde and Peckham responded to the notice of default through counsel and summarily disputed the allegations. Runde and Peckham took no action to cure any of the multiple instances of default.

67.    The next week, Harris inspected each of the West 160 operating facilities. He found severe environmental degradation consistent with his prior observations, including large pools of oil on the ground. He also found that nearly all of the Equipment was missing or badly damaged.

68.    Harris contacted Runde and Peckham to inquire about the extremely poor conditions he observed at the Premises and to find out whether they would follow through on their earlier promise to purchase the Premises and Equipment.

69.    Peckham responded via text message on October 2, 2014. In this—his first communication with Harris since firing him on February 3—he told Harris, "we are very close to closing our deal with you. I made a promise to you from the very beginning to do my very best

13

to make this all work. It looks like that will happen. Please be patient for a few weeks till we get it all finalized."

70.     In another text message sent the next day, October 3, 2014, Peckham wrote: "I'm sure we will get this deal closed shortly at the original deal [sic] as promised. I have no reason to believe otherwise."

71.     On October 27, 2014, Runde and Peckham offered to buy the Premises for the then-remaining balance on the Premises' mortgages ($1,191,592), and offered to buy the Equipment for $359,801—a 68% discount from the price the parties agreed to under the Option Agreement. Harris was not willing to accept this offer, and he so informed Runde and Peckham.

72.     Runde, well aware that the conduct of himself and Peckham had put the Harris's in a precarious financial position, attempted to intimidate the Harris's into accepting his cut-rate offer for the Premises and Equipment. On October 30, 2014, the penultimate day of the lease term, Runde wrote to Harris via text message: "I'm here to bail u [sic] out of bankruptcy[,] where are you?"

73.     On the same day he sent the above text message, Runde visited Shane Davis, a Vice President of Centennial Bank in Mountain Home, Arkansas. Davis was responsible for Harris's loans on some of the West 160 Premises. Runde told Davis he would offer Centennial "50 cents on the dollar" to buy out Centennial's loans on the Premises due to the properties' "environmental problems." Davis, who knew the Premises had had no environmental problems when under Harris's management, rejected the offer. Davis later reported this conversation to Harris.

74.     On October 31, 2014, the final day of the lease term under the Lease Agreement, Harris was out of town for most of the day. When he returned to West Plains late in the evening,

he found several items of the Equipment sitting across the street from the entrance to the West 160 Scrap & Salvage facility, in preparation to be moved elsewhere.

75.     The next day, workers acting under the direction of Runde and Peckham came to move the items of Equipment. Harris called the sheriff's department, but the responding officers refused to intervene, and the workers hauled away the items of Equipment.

### *Runde and Peckham Drive the Harris's Into Bankruptcy for Their Own Benefit*

76.     Over the next several days, Harris undertook an inspection of each of the West 160 operating facilities. Harris found that nearly all of the Equipment was damaged, disassembled, or missing. Even worse, standing pools of oil and similarly blatant environmental pollution was present throughout the Premises.

77.     Harris also found that the approximately $250,000 of scrap metal stored at the Premises under the Storage Agreement was no longer present. However, Mighty River has never paid Harris any portion of the storage fee due under the Storage Agreement.

78.     Around the same time, Harris learned that Defendants did not make their final rent payment or certain property tax payments that were due under the Lease Agreement. These payments have never been made.

79.     Since the end of the lease term, Harris has also learned that during the lease term, Defendants used West 160's accounts with several vendors to purchase goods and services. Defendants had no right to make such purchases on West 160's account under any agreement, and have not paid for such purchases.

80.     Due to the extremely poor condition in which the Premises and Equipment were returned to him, Harris determined it was economically impossible for West 160 to resume operations.

15

81.     On November 10, 2014, as a direct result of Defendants' conduct, West 160 filed a voluntary petition under Chapter 11 in the United States Bankruptcy Court for the Western District of Missouri, case no. 14-61498.

82.     On March 2, 2015, as a direct result of Defendants' conduct, Jennifer Harris filed a voluntary petition under Chapter 11 in the United States Bankruptcy Court for the Western District of Missouri, case no. 15-60181.

83.     In May 2015, the remaining Equipment was put up for auction as part of the bankruptcy proceedings. Upon information and belief, Defendants bid on some or all of the Premises through third parties and intermediaries.

84.     In August 2015, each of the Premises was put up for auction as part of the bankruptcy proceedings. Upon information and belief, Defendants bid on some or all of the Premises through third parties and intermediaries.

85.     Upon information and belief, Defendants intend to use whatever portions of the Equipment and Premises they have purchased to establish a scrap recycling operation in the area formerly served by West 160.

86.     In sum, Defendants intentionally and maliciously defrauded the Harris's in order to acquire their property and West 160's assets at below fair market value. Defendants are responsible for the complete and total destruction of West 160's business and the Harris's livelihood.

## COUNT I
## ACTION TO PIERCE THE CORPORATE VEIL

87.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

16

88.     Bi-State is a Missouri limited liability company. Upon information and belief, Bi-State does not presently maintain a principal place of business in Missouri, or elsewhere.

89.     According to Bi-State's corporate tax return, its members are Mighty River and Clayton County, with each member owning an equal 50% share. *See* Exhibit E at 6.

90.     At other times, however, Runde and Peckham have given sworn testimony identifying themselves as Bi-State's owners. *See* Exhibit F at 2:10-16; 10:1-4; 16:13-15; 23:12-14.

91.     In August 2014, Runde and Peckham entered an agreement with the owners of a business adjacent to the Spring River Recycling property in Hardy, Arkansas. The agreement provides for the parties to share certain expenses related to a common water supply (the "Water Supply Agreement"). The agreement, which was notarized and filed with the clerk of Fulton County, Arkansas, identifies Runde and Peckham as Bi-State's owners. *See* Exhibit G.

92.     Bi-State's bank statements were sent directly to Gina Roys, a Clayton County employee working out of Monona, Iowa, who was never paid or employed by Bi-State.

93.     Bi-State's bank statements from January through March 2014 show no deposits or transfers from buyers of scrap metal, but show repeated transfers of amounts up to $50,000 from Mighty River to Bi-State.

94.     Some of the equipment Runde and Peckham used while operating at the Premises during the lease term was owned by Mighty River or Clayton County, but Bi-State did not pay those entities for use of their equipment.

95.     Upon information and belief, Bi-State has been undercapitalized since its inception and has failed to observe corporate formalities.

96.     As described above and throughout the Complaint, Bi-State was controlled and influenced by Defendants such that it was a mere instrumentality of Defendants with no separate mind, will, or existence of its own.

97.     As described above and throughout the Complaint, Defendants used Bi-State to commit fraud and other wrongdoing against Plaintiffs, to perpetrate the violation of Plaintiffs' legal rights, to perpetrate dishonest and unjust acts in contravention of Plaintiffs' legal rights.

98.     Defendants' use of Bi-State to perpetrate such fraud and wrongdoing has been the actual and proximate cause of injury to Plaintiffs.

99.     Accordingly, Bi-State's corporate identity should be disregarded such that Defendants are held liable for its fraud and other wrongdoing alleged herein.

WHEREFORE, Plaintiffs pray for an Order ruling that Bi-State's corporate identity shall be disregarded for the purposes of all counts alleged in this Complaint, and that Defendants shall be held jointly and severally liable for all conduct and transactions performed under Bi-State's name and identity.

## COUNT II
## RESOURCE CONSERVATION AND RECOVERY ACT ("RCRA")
### (42 U.S.C. § 6901 *et seq.*)

100.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

101.     RCRA § 7002(a)(1)(B) (42 U.S.C. § 6972(a)(1)(B)) provides that any person may commence a civil action against the any person who has contributed to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or to the environment.

18

102.     During the lease term under the Lease Agreement, Defendants contributed to the handling, storage, treatment, transportation, and disposal of motor oil and other solid and hazardous wastes on and about the Premises.

103.     Defendants handled, stored, treated, transported, and disposed of such solid and hazardous wastes in a manner which has allowed them to leach pollutant into soil and ground water beneath and adjacent to the Premises. Such conduct constitutes "land disposal" as defined under RCRA § 3004(k) (42 U.S.C. § 6924(k)).

104.     Upon information and belief, the solid and hazardous wastes stored, treated, transported, and disposed of by Defendants include those defined as liquid hazardous wastes under RCRA § 3004(d)(2) (42 U.S.C. § 6924(d)(2)).

105.     Such solid and hazardous wastes are known to be hazardous to the environment and human health, and, if released into the environment in sufficient quantity, pose and imminent and substantial risk to the environment and human health.

106.     Upon information and belief, the pollutants released by Defendants at the Premises are in sufficient quantity to pose an imminent and substantial risk to both the environment and human health.

107.     Defendants' failure to remediate or redress the risk caused by their handling, storing, treatment, transportation, and disposal of solid and hazardous wastes at the Premises has irreparably harmed the Harris's, in that it destroyed the marketable value of the Premises at a time they were owned by the Harris's.

108.     The Harris's have given notice of Defendants' violation to all relevant parties as required under RCRA § 7002(b)(2)(A) (42 U.S.C. § 6972(b)(2)(A)). The notice letter and proof of receipt by each party are attached as <u>Exhibit D</u>.

19

109.     As the Harris's allege Defendants have violated RCRA § 3004 (42 U.S.C. § 6924), they are entitled to bring this action immediately after giving notice, as stated in RCRA § 7002(b)(2)(A) (42 U.S.C. § 6972(b)(2)(A)).

WHEREFORE, the Harris's pray for an injunction compelling Defendants to remediate the Premises such that they no longer pose an imminent and substantial risk to the environment or human health, for civil penalties to be imposed in the amount of $25,000 per violation per day as authorized under 42 U.S.C. §§ 6928(g) and 6972(a), for their costs and attorney's fees as authorized under 42 U.S.C. § 6972(e), and for all other relief the Court deems just and proper.

## COUNT III
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
### (18 U.S.C. § 1961 *et seq.*)

110.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

111.     Under 18 U.S.C. §§ 1962(c) and 1964(c), any persons injured in their business or property may bring a civil action against any persons employed by or associated with an enterprise engaged in interstate commerce who conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

112.     Bi-State is an "enterprise," as defined by 18 U.S.C. § 1961(4), that has engaged in interstate commerce through its operation of scrapyards in Missouri and Arkansas.

113.     Defendants are "person[s]," as defined by 18 U.S.C. § 1961(3), who are employed by or associated with Bi-State.

114.     Defendants have conducted or participated, directly or indirectly, in Bi-State's affairs through a pattern racketeering activity designed to defraud Plaintiffs, and have thereby violated 18 U.S.C. § 1962(c).

115. Defendants' acts of "racketeering activity," as defined by 18 U.S.C. § 1961(1), include mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

116. As described throughout the Complaint, Defendants knowingly participated in a scheme to defraud Plaintiffs by (i) fraudulently inducing them to enter the Lease Agreement and Option Agreement, so that (ii) Defendants could gain control of the Premises and Equipment, (iii) destroy the marketable value of the Premises and Equipment, and (iv) force Plaintiffs to sell them the Premises and Equipment under financial duress and at a steep discount.

117. Defendants knowingly used the interstate mails in furtherance of this scheme to defraud, in that, in early December 2013, they knowingly mailed or caused to be mailed to Plaintiffs through interstate mails the Option Agreement that Plaintiffs subsequently executed.

118. Defendants knowingly used the interstate mails in furtherance of this scheme to defraud, in that, on December 3, 2013, they knowingly mailed or caused to be mailed to Plaintiffs through interstate mails the Option Agreement that Plaintiffs subsequently executed.

119. Defendants knowingly used the interstate mails in furtherance of this scheme to defraud, in that, upon information and belief, in August 2014, Defendants knowingly mailed or caused to be mailed the Water Supply Agreement, in which Runde and Peckham falsely identified themselves as the owners of Bi-State.

120. Defendants knowingly used the interstate mails in furtherance of this scheme to defraud, in that, on October 27, 2014, Defendants' counsel, acting on Defendants' behalf, mailed or caused to be mailed to Plaintiffs' counsel a letter in which Defendants offered to buy the Premises and Equipment at a price significantly lower than that agreed upon in the Option Agreement.

121.     Defendants knowingly used interstate wire communications in furtherance of this scheme to defraud, in that, on multiple occasions in the latter half of October 2014, Runde and Peckham told Harris via telephone that they would purchase the Premises and Equipment.

122.     Defendants knowingly used interstate wire communications in furtherance of this scheme to defraud, in that, from January through March 2014, Mighty River repeatedly made wire transfers to Bi-State in amounts up to $50,000, to further their portrayal of Bi-State as a legitimate company, rather than an undercapitalized and fraudulent instrumentality of Defendants.

123.     Defendants knowingly used interstate wire communications in furtherance of this scheme to defraud, in that, on October 2 and 3, 2014, Peckham knowingly sent to Harris via cellular telephone text messages in which he falsely represented that Defendants would close on a deal to purchase the Premises and Equipment as originally promised.

124.     Defendants knowingly used both the interstate mails and interstate wire communications in furtherance of this scheme to defraud, in that, on September 29, 2014 Defendants' counsel, acting on Defendants' behalf, sent via interstate mail and interstate electronic mail a letter in which Defendants falsely disputed Plaintiffs' allegations of default of the Lease Agreement, and, without legal basis, refused to accept the notice of default.

125.     Defendants' racketeering activity constitutes a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), in that there were at least two acts of racketeering activity, one of which occurred after RICO's effective date, and the last of which occurred within ten years after the commission of a prior act of racketeering activity.

126.     Defendants' racketeering activity was continuous and related, in that it was part of a greater fraudulent scheme designed to persuade Plaintiffs that Bi-State would purchase the

Premises and Equipment if Plaintiffs executed the Lease Agreement. In truth, Defendants' motive in causing Bi-State to execute the Lease Agreement, and in inducing Plaintiffs to do the same, was to obtain possession of the Premises and Equipment so that they could destroy their marketable value and force Plaintiffs to sell them the Premises and Equipment under financial duress and at a steep discount.

127.     Plaintiffs' business and property have been injured as a direct and proximate result of Defendants' pattern of racketeering activity.

WHEREFORE, Plaintiffs pray for damages in an amount to be determined at trial, for treble damages as authorized under 18 U.S.C. § 1964(c), for punitive damages, for their costs and disbursements in this action, and for all other relief the Court deems just and proper.

**COUNT IV**

**FRAUDULENT INDUCEMENT**

128.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

129.     Defendants represented to Plaintiffs that:

    A.     They would purchase the Premises and Equipment no later than March 1, 2014, if Plaintiffs executed the Lease Agreement.

    B.     They would reimburse Plaintiffs for all purchases of scrap made in the latter half of October 2013.

    C.     The Lease Agreement was terminable by Plaintiffs at any time with thirty days' notice.

130.     Defendants' representations were false.

131.     Defendants' representations were material to Plaintiffs' decision to execute the Lease Agreement.

23

132.    Defendants knew at the time they made the representations that they would not purchase the Premises or Equipment on or before March 1, 2014, or fully reimburse Plaintiffs for their purchases of scrap, and that the Lease Agreement was not terminable by Plaintiffs upon thirty days' notice.

133.    Defendants intended for Plaintiffs to rely on their representations and intended that their representations would induce Plaintiffs to execute the Lease Agreement.

134.    Plaintiffs did not know Defendants' representations were false at the time it they were made.

135.    Plaintiffs had the right to rely on Defendants' representations.

136.    Plaintiffs have been injured as a direct and proximate result of their reliance on Defendants' representations.

WHEREFORE, Plaintiffs pray for damages in an amount to be determined at trial, for punitive damages, for their costs and disbursements in this action, and for all other relief the Court deems just and proper.

## COUNT V
## FRAUDULENT NONDISCLOSURE

137.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

138.    Defendants did not disclose to Plaintiffs prior to Plaintiffs' execution of the Lease Agreement that:

      A.    They did not intend to purchase the Premises or Equipment before March 1, 2014.

B.  They intended to destroy the marketable value of the Premises and Equipment during the lease term so that they could attempt to force Plaintiffs to sell the Premises and Equipment to them under financial duress and at a steep discount.

C.  They did not intend to reimburse Plaintiffs for all purchases of scrap made in the latter half of October 2013.

D.  The Lease Agreement was not terminable by Plaintiffs at any time with thirty days' notice; but was only so terminable by Defendants.

139.    Defendants had a duty to disclose such information to Plaintiffs because such information was known by Defendants, but was not reasonably available to Plaintiffs.

140.    Had Defendants disclosed such information to Plaintiffs, Plaintiffs would not have executed the Lease Agreement.

141.    Defendants intended for Plaintiffs to rely on their nondisclosure and intended that their nondisclosure would induce Plaintiffs to execute the Lease Agreement.

142.    Plaintiffs were not aware of, and could not reasonably have discovered, the undisclosed information at the time they executed the Lease Agreement.

143.    Plaintiffs had the right to rely on Defendants' nondisclosure.

144.    Plaintiffs have been injured as a direct and proximate result of Defendants' nondisclosure.

WHEREFORE, Plaintiffs pray for damages in an amount to be determined at trial, for punitive damages, for their costs and disbursements in this action, and for all other relief the Court deems just and proper.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

145.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

146.     Defendants represented to Plaintiffs that:

    A.     Defendants would purchase the Premises and Equipment no later than March 1, 2014, if Plaintiffs executed the Lease Agreement.

    B.     They would reimburse Plaintiffs for all purchases of scrap made in the latter half of October 2013.

    C.     The Lease Agreement was terminable by Plaintiffs at any time with thirty days' notice.

147.     Defendants made these representations in the course of their business.

148.     Defendants made these representations for the guidance of Plaintiffs when Plaintiffs were deciding whether to execute the Lease Agreement.

149.     Plaintiffs justifiably relied on Defendants' representations.

150.     Defendants did not exercise reasonable care in making their representations, and such representations were false.

151.     As a direct and proximate result of Plaintiffs' reliance on Defendants' representations, Plaintiffs suffered pecuniary loss.

WHEREFORE, Plaintiffs pray for damages in an amount to be determined at trial, for punitive damages, for their costs and disbursements in this action, and for all other relief the Court deems just and proper.

26

**COUNT VII**

**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**

152.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

153.     Plaintiffs had a valid business expectancy in selling the Premises and Equipment to a third party or third parties prior to the execution of the Lease Agreement.

154.     Defendants had knowledge of Plaintiffs' business expectancy.

155.     Defendants intentionally interfered with Plaintiffs' business expectancy by first inducing them to enter the Lease Agreement and Option Agreement, and then destroying the marketable value of the Premises and Equipment such that Plaintiffs could no longer market the Premises or Equipment for sale.

156.     Defendants have no justification for their conduct.

157.     Plaintiffs have been injured as a direct and proximate result of Defendants' interference with their expectancy.

WHEREFORE, Plaintiffs pray for damages in an amount to be determined at trial, for punitive damages, for their costs and disbursements in this action, and for all other relief the Court deems just and proper.

**COUNT VIII**

**BREACH OF CONTRACT**

**(Lease Agreement)**

158.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

159.     The Lease Agreement is a valid contract between Plaintiffs and Defendants (acting through Bi-State, whose independent corporate identity should be disregarded).

27

160.     Plaintiffs performed all of their obligations under the Lease Agreement.

161.     Defendants breached the Lease Agreement by committing waste, by using the Premises in a manner that conflicted with environmental laws and regulations, by failing to deliver possession of the Premises and Equipment in the same condition as received, by failing to pay all rent and taxes due under the Agreement, and by failing to insure the Equipment and Premises for the benefit of their respective owners.

162.      Plaintiffs have been injured as a direct and proximate result of Defendants' breach.

WHEREFORE, Plaintiffs pray for damages in an amount to be determined at trial, for attorney's fees as authorized under section 21 of the Lease Agreement, for their costs and disbursements in this action, and for all other relief the Court deems just and proper.

## COUNT IX
## BREACH OF CONTRACT
### (Storage Agreement)

163.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

164.     The Storage Agreement is a valid contract between West 160 and Mighty River.

165.     West 160 performed all of its obligations under the Lease Agreement.

166.     Mighty River breached the Lease Agreement by failing to pay the storage fee provided for under section 4 of the Agreement.

167.     West 160 has been injured as a direct and proximate result of Mighty River's breach.

28

WHEREFORE, Plaintiffs pray for damages in an amount to be determined at trial, for attorney's fees as authorized under section 16 of the Storage Agreement, for their costs and disbursements in this action, and for all other relief the Court deems just and proper.

## COUNT X
## BREACH OF FIDUCIARY DUTY
### (Storage Agreement)

168.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

169.     The Storage Agreement created a partnership between West 160 and Mighty River because it provided that each of them would contribute labor, skill, or resources toward a lawful commercial endeavor (the sale of ferrous scrap metal) and divide the profits equally.

170.     As a partner of West 160, Mighty River owed West 160 a fiduciary duty to make full disclosure of all material facts within its knowledge in relation to the partnership affairs, to exercise utmost good faith in all mutual relations, to be candid concerning business opportunities, to not put self-interests before the interests of the partnership, and to not compete with the partnership or the business of the partnership.

171.     Mighty River breached its fiduciary duty to West 160 by participating in the scheme to induce Plaintiffs to enter the Lease Agreement and Option Agreement, by participating in the destruction of the marketable value of the Premises and Equipment, and by failing to share the partnership's profits with West 160.

172.     West 160 has been injured as a direct and proximate result of Mighty River's breach.

WHEREFORE, Plaintiffs pray for damages in an amount to be determined at trial, for attorney's fees as authorized under section 16 of the Storage Agreement, for their costs and disbursements in this action, and for all other relief the Court deems just and proper.

## COUNT XI
## WASTE
### (Mo. Rev. Stat. § 537.420)

173.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

174.     Under the Lease Agreement, Defendants were a tenant for years of the Premises.

175.     Defendants' wanton failure to use proper care in handling and disposing of pollutants and hazardous substances on the Premises caused permanent diminution in the value of the Premises.

176.     Harris and Jennifer Harris, as owners of the Premises in fee simple at the time of Defendants' conduct, have been injured as a direct and proximate result of Defendants' breach.

WHEREFORE, Plaintiffs pray for damages in an amount to be determined at trial, for treble damages as authorized under Mo. Rev. Stat. §§ 537.420 and 537.490, for punitive damages, for their costs and disbursements in this action, and for all other relief the Court deems just and proper.

## COUNT XII
## CONVERSION

177.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

178.     West 160 owned all items of the Equipment leased under the Lease Agreement.

179.     Defendants retained possession of items of the Equipment beyond the duration of the lease term with the intent to exercise control over the same.

30

180.     Defendants thereby deprived West 160 of its right to possession of the items of Equipment.

WHEREFORE, Plaintiffs pray for damages in an amount to be determined at trial, for punitive damages, for their costs and disbursements in this action, and for all other relief the Court deems just and proper.

## COUNT XIII
## UNJUST ENRICHMENT

181.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

182.     West 160 conferred a benefit upon Defendants through its purchase of scrap metal in the latter half of October 2013, upon reliance Defendants would reimburse it for such purchases.

183.     West 160 constructively conferred a benefit upon Defendants through the goods and services that Defendants charged to West 160's accounts with vendors.

184.     Defendants appreciated the benefits of West 160's scrap metal purchases, and of the goods and services it charged to West 160's accounts.

185.     Defendants' acceptance and appreciation of such benefits is inequitable and unjust, in that West 160 has paid or been held responsible for the costs of those benefits, but did not appreciate any of the benefits.

WHEREFORE, Plaintiffs pray for damages in an amount to be determined at trial, for punitive damages, for their costs and disbursements in this action, and for all other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury on all issues so triable.

Dated: October 21, 2015                    Respectfully submitted,

                                           **EDGAR LAW FIRM LLC**


                                            */s/ Matthew J. Limoli*
                                           John M. Edgar          MO Bar # 20524
                                           Matthew J. Limoli      MO Bar # 63971
                                           1032 Pennsylvania Avenue
                                           Kansas City, Missouri 64105
                                           Telephone:  (816) 531-0033
                                           Facsimile:   (816) 531-3322
                                           jme@edgarlawfirm.com
                                           mjl@edgarlawfirm.com

                                           *Attorneys for Plaintiff*